We'll call now our final case scheduled for argument today. Ricardo Jimenez v. City of New York. Mr. Kellner. Thank you, Your Honor. Good morning, Your Honors. I may have placed the court. My name is Joshua Kellner, and I represent Ricardo Jimenez. The task for a court on a motion to dismiss is not to reach the ultimate merits of a case, nor is it to decide which version of events presented by the two parties it believes to be more credible. It is simply to determine whether there are sufficient factual allegations in the complaint that the matter should be permitted to proceed. In this case, the district court respectfully strayed far beyond that boundary. It reached the ultimate merits of the case, even on some highly fact-sensitive issues. It resolved issues of witness credibility on the pleadings, and it discounted findings made by the habeas court, effectively determining that they were not even plausible on certain points. An allegation of official misconduct by a police officer, like any other species of allegation, is supposed to be presumed true on a motion to dismiss. And that's particularly so in a case like this, where the complaint- Wait a second. You know, we have hundreds of cases in which defendants say, I should not be found guilty because the police did misconduct, and we don't pay much attention to it. Now, there are two things that are different here. Here you say, there's considerably more evidence of police misconduct than in those cases, and here you're being a plaintiff, you're not being a defendant. So that may make the ordinary cases not be there. But you know, you cite some cases which say, oh well, this is all right, when a party just says the police misconduct. But you know, sitting here for 30 years, I hear that made by almost every defendant, and we ignore it most times. So I'd like you to just be quite clear as to why in this case, because of the status of plaintiff and what there was, that this is different. Yes, Your Honor, two points. Number one, we're here on a 12B6 motion where we're a plaintiff, and allegations in a complaint are entitled to a certain status. Second, the allegations- Non-conclusory, plausible allegations. Yes, non-conclusory. But here, it's a highly detailed complaint. They're not conclusory. It's even supported, though we weren't required to, with corroborating evidence. And they align with prior judicial findings made by Judge Etkin in context of the habeas petition. Well, so that goes to a Brady claim. And so you've got a Monell claim based on that. But are anything in Judge Etkin's findings that pertain to malicious prosecution? Yes, Judge. And well, and actually specifically fair trial? Yes, Judge. Judge Etkin first found that the interrogation of Mr. Blalock was suggestive. Second, he found that both Stratford and O'Brien's testimony was subject to question on its credibility based on the documents that were disclosed on the Brady violation. So while you have a formal finding of a Brady violation, there are also many findings in the opinion and in the analysis that cast question on the credibility of O'Brien and the validity of the Blalock statement implicating the plaintiff. Could you maybe just speak a little more specifically in terms of the allegations with regard to malicious prosecution and how it satisfies the initiation requirement, the rebuttal of the presumption of probable cause from the grand jury indictment? What are these specific allegations? Thank you, Your Honor. I'll start first with initiation. And then I'll get to the rebuttal of probable cause. First, as to initiation, a number of courts have found that in context of a malicious prosecution case, the initiation element can be met where there is evidence adduced by police officers that they know will go into a determination of probable cause, which is false. In fact- When you say they know will go into a determination, it seems like more of the cases refer to it as forwarding false information to the prosecution. Well, in Bermuda, as Judge Calabrese noted, one example of something that can represent forwarding or initiation as generating false reports. And that's in the Bermuda's case on page 377. And if you generate a false report, though, that is not, you are working on a case, you generate a false report. You, for whatever reason, don't go forward with it. To your mind, the case is closed. There's still a file somewhere with a document in it that has that false report. And then a decade later, more than a decade later, someone goes into that file and uses that false report. That, to your mind, still satisfies? Well, I'll differentiate between malicious prosecution and fair trial. Certainly there are different requirements on the fair trial claim. But as to malicious prosecution, the answer I would give in short is yes. It's not necessary that you foresee exactly how it's going to be used. The fact that you have planted the seed of the poison tree that bears fruit sometime later is still sufficient under appropriate circumstances to make out the initiation element. So you're saying that time, of course, is relevant, but time can't be determinative if there is a link. Yes, Your Honor. And you're saying that here, at least at the 12B6 level, there was enough said to be a link. Yes, Judge. And on the issue of proximate cause, time can sometimes be a factor, but the issue of proximate cause is not one for a motion to dismiss here. So that's initiation. Then let me get to why probable cause is rebutted. And I'll focus first on Mr. Blaylock, which relates to Serrano and Horn, and then I'll talk about O'Brien as well. For Mr. Blaylock, it's important to note that he identified originally a completely different person. He said that it was somebody named Leon who had a different hairstyle than plaintiff, apparently a different ethnicity, and said that he knew him extremely well. He was able, and this is in the DD-5 at page 114 of the record, to talk about his criminal background, what car he drove, where he lived, even what car he used to have before the current car that he drove. He then goes to the precinct where the detectives, when he's at the age of 15, and in their words, confront him, and he emerges from the precinct implicating an entirely different person, who he then testifies at trial that he had never been introduced to at all. The key question in the case is what caused that change, but there is certainly ample evidence from which one could infer that it was a child. Sorry, when you say he identified an entirely different person, tell me, so, some of those, what's your basis for that? What are the allegations that go to that, as opposed to him concluding that Mr. Jimenez is who he refers to as Leon? Sure, well, first of all, just on its face, Mr. Jimenez's name is not Leon. He said that Leon had blonde streaks distinctively cut and dyed into his hair. Mr. Jimenez never had that. He said that Leon had a gold tooth. There's no evidence that Mr. Jimenez ever had that. He said that he knew Leon well and gave a whole bunch of background information about him, which I talked about a moment ago. None of that correlates to anything having to do with Mr. Jimenez. He's simply a different person. And Blalock's original description of Leon also aligned with what every other person who was at the scene said about who did it. So it's not that there's this split where everybody says, here's what he looks like, it resembles Ricardo Jimenez, but some people say his name is Leon and some people say they don't know what his name is. They're all describing someone who, as Sharon Maramuth described it, of a Parian, Jamaican, or Indian ancestry, a flashy dresser, a flat-top haircut, a gold tooth, and of course, the blonde streaks. None of that matches Ricardo Jimenez. Then there's the suspicious nature of the encounter at the station, where the police, in their own words, they're bringing two teenagers in to confront them. And we don't know why they're confronting them to begin with, other than that they couldn't find Leon despite prior efforts. They then go in, they talk for a while between the two of them, in circumstances fairly similar to what this court found in Bermudez was suggestive. And then somehow Sharon Maramuth, who wasn't even at the crime scene, comes to say that Ricky is the perpetrator, and then she is the one who then picks out his photograph first before it's presented to Blaylock. And Ms. Maramuth, in her affidavit, says none of this ever happened and she doesn't know what they're talking about. So all of this is sufficient evidence to go forward in the case. Sorry, on that last point, she says she doesn't recall that, right? Well, she says that she never knew the person and that she never identified the person. She doesn't recall identifying the person. She says that she, if I might, Your Honor, I believe that she said that she never knew this person. It's on page 123 of the record. She says that she has no recollection of making it, but then on page 121, which is also Ms. Maramuth, and it's witnessed by Richard Greenberg from the OAD, I, Sharon Randrup, affirm that I do not know and have never known the person in this photograph. So she's saying that none of this happened and she's denying that she identified him. So for all those reasons, as to Blaylock, there is more than enough there to say that this was an improper identification. Then getting to Stratford's role later on in the process. First, his encounters with Blaylock. If Blaylock had consistently, and by the way, he recanted, which is why the case originally was dropped. Blaylock then comes in and even in his statement to an investigator, describes a suggestive process where he had to be coached to implicate plaintiff anew. And then as, and I've talked about the issues at the root of Blaylock already, but turning to O'Brien. This is somebody who, when he first spoke to the FBI, in 1997, was required to detail his knowledge of a litany of crimes. And he gave a 30-page memorialized interview with a number of people, including a New York City homicide detective, where he told his entire life story. And when he's shown a picture of Sean Worrell, he just says that this gentleman, whose name he gets wrong, was killed in a theater. He doesn't even say that he was there, let alone that he had knowledge of the crime. O'Brien then, after receiving a sentencing reduction, starts writing letters to the district judge in his case, saying that he's desperate for a further reduction. He then comes to be interviewed by Stradford, who in the memorandum requesting the interview is somehow able to say that he's going to identify Jimenez before he ever even sets foot in the door. He then gives a description of the perpetrator that to call it vague would be charitable. He said he might've been wearing light clothing, he might've been shorter than me, he may have had a particular hairstyle, or maybe not, but none of which actually resembles Jimenez, until Stradford puts a photo of Jimenez in front of him. There is ample reason to believe that O'Brien's testimony implicating Jimenez also was brought about improperly, and Judge Etkin found in his opinion that the 1997 agreement, and additionally the fact that O'Brien said some clearly untrue things about trial, at trial about how he came to identify him, those all cast doubt on his credibility. And particularly here at the 12B6 stage, that should be more than enough for the case to go forward and to give plaintiff the chance to reduce Jimenez. How do we deal with the grand jury? With the presumption that what the grand jury found was fine, unless there was wrongdoing before the grand jury? Well, I think what I would say, Your Honor, is to go back to your opinion in Bermudez, which is that once a witness is improperly coached or coaxed to make an improper identification, they may persist in it for any number of reasons, whether because they feel boxed in, or because consistent with social science literature, they come to believe that it's correct. But here, everything that came before the grand jury that we're aware of at this juncture of the case, which of course we don't have the full minutes, is that it was all tainted evidence. We know that Blaylock testified, and we've talked about why that's tainted. We have to assume from the tainting before and what little we know about the grand jury that it was tainted. We have to assume the ferocity of the allegations to such effect, I would agree with that. But doesn't that sort of flip the presumption? I mean, if we're saying if a case gets to the point where there is an indictment, it seems as if the idea is, if there is a misconduct in the grand jury, that is the thing that can rebut the presumption. But your argument seems to be that, well, because this initiation had what you view relating problems or is false evidence, then inherently, there's no presumption, and so therefore, the probable cause is satisfied. Well, the case law says that where an indictment is a product of fraud, irregularity, or fabricated evidence, that it's sufficient to vitiate that presumption. But I don't think that we need to get to any of that at this stage of the case. It's enough to say that plaintiff has alleged that the indictment was a product of that conduct. And that what you're saying is that we have enough so that we can get to that point, and then at that point, maybe see what was said to the grand jury, which at the moment, we don't have. So for us to make a judgment as to whether any of these, which you say were false things, were before the grand jury is hard for us to decide. I mean, if we say no, then however bad the stuff before, we can't ever deal with it. You know, that's your argument. And also, even if we look at what Stratford did say to the grand jury, and I don't know how to address this because it's in sealed things, but he did describe his encounter with Blaylock different than what Blaylock said in his statement to the investigator. But none of that is a bar on the fair trial claim. On the fair trial claim, and I know that I'm already significantly over time and haven't even really gotten to it. No, no, keep going. But on the fair trial claim, none of these procedural roadblocks have any relevancy. It's fabricated evidence. We've sufficiently alleged that. There's no issue as to probable cause. And there's not an initiation element. It is simply consistent with the case law, whether it makes it to the prosecutor in a way that taints the case. And so the fair trial claim clearly is well pleaded. And none of the procedural roadblocks have currency in that context. Turning to the failure to intervene claim extremely briefly, and then I do want to talk about Monell. On the failure to intervene claim, courts have frequently held that it's impossible for a plaintiff to know exactly which officer did what prior to discovery. And they've given some tolerance that it's enough to show that they're all in the room when the misconduct happens. We did that here. And then on the Monell claim. First, we have, and this wasn't the basis for the district court's opinion, shown a sufficient pattern. We've shown in our appendix a number of cases. First, we have to get to the point that there was a Brady violation, and the district court seemed to think that the Brady violation has to be intentional in order to bring a 1983 suit. So does it have to be intentional, and was there enough evidence, even if it had to be intentional, on 12B6 that this was intentional? Yes, Judge. First, it doesn't have to be intentional. The cases that the city cites on that point all involved police officers, and none of them involved a Monell claim. The mens rea, as it were, on a Monell claim is deliberately indifference by the policymaker. And there's no artificial requirement on the type of Brady violation in context of a district attorney's office that can go into that pattern. In fact, the mere fact that we have, in a Monell context, negligent or failure to train claims, against DA's office, that implies that it isn't just going to be intentional violations, because a failure to train claim implies that if you trained the person the right way, they would have done the right thing, which doesn't really fit for intent. But there's been no holding that in context of a Monell claim against a DA's office, that there's a restriction on the pattern. Okay, now assume we say that either it is sufficient evidence of intention, doesn't have to be intentional. What do we do? The district court never reached the Monell. Is that something that we can decide? Must we send it back to the district court? How does that stand, technically? I'll just quickly note that we also did plead that it was intentional, and the DA's office does, but no, I think it's something that this court can reach. The city discusses it in its brief. I think it's properly before the court, and I think there's no need for a limited remand. But that's quite unusual for us to decide an issue like that. It must be very fact intensive without getting first a judgment by the district court, isn't it? I would say that on the unique facts of this case, where the city did raise the issue of pattern, though they didn't raise the argument that the district court ultimately held on, it was properly before the court, and it's properly briefed before this court, and we are de novo trying to determine the adequacy of the pleading. I don't think we're in excess of that. I don't mean that we can't, that we're forbidden from it, but I'm just asking sensibly, are we the kind of court that is suited to do a judgment on whether there is a pattern or so, or is that something that really ought to look for more fact finding? Well, I think there wouldn't be, well, there wouldn't be fact finding. I think it's on the pleading, but I think it warrants fact finding. I think it's not something that warrants dismissal in the 12D6 context. I have one other small question. You did not appeal the dismissal of the state negligence claim. You didn't appeal it. The finding there was that there couldn't be state negligence because there was no individual wrong. If we find instead, as part of your argument, there was individual wrong, what happens then? Your Honor, I believe it was a footnote in our brief, if I'm not mistaken, and I'll try to flag it for the court on rebuttal, unless I'm wrong, but in either event, the claim should be restored. I'm sorry? I believe we had a footnote in our brief saying that because the finding as to the state law claims was based on the federal law claims that they should be reinstated as well. So you are not abandoning it? No, I believe that we reinstated it, Your Honor. I may, to the extent that I'm mistaken, I'll tell the court on rebuttal, but I believe that it was fine. Yeah, find it, because I didn't see it, it was dead. I'm sorry, Judge Nathan. I didn't say anything. Oh, in that case, I will rest on my brief. All right, thank you. May it please the court, Alex Fomelli for the city of New York. Part of my role here is to make it clear that we are not here to re-litigate the habeas decision or to re-litigate whether there was a Brady violation. The real point is that it is all too easy to state in a complaint that a defendant induced or coerced a witness to testify, or excuse me, to identify someone, or that a defendant had actual malice or resented the defendant's actions. This is deliberately indifferent. A complaint should allege how, and the district court here dismissed the complaint because those legal conclusions, even accounting for reasonable inferences on the facts, were simply not supported by specific factual allegations. That is the thrust of the city's position almost across the board on this case. In our brief, we have endeavored in many places to explain what we think appellant means when he says that evidence was fabricated or otherwise. Let me put it to you. Here you have a very, very good and careful district judge on habeas, finding things, ultimately on the Brady issue, but with suggestions about everything else. In suggestions that you cannot read Judge Aitken's opinion without saying, this smells. Now, this is a judge who is facing an edpa level before he can decide to grant habeas. Despite that, and with that language, he grants it. And no appeal is taken. No retrial is made. Now, why isn't that miles away from the ordinary case of somebody saying, the cops lied, where we say, oh, come on, give us more. I mean, just, maybe I'm not being legalistic enough, but I'm just saying, I read that, and I know how careful Judge Aitken is. And then say, why doesn't this, you know, I'm not saying it's fair, but at least get beyond 12B6. I understood Judge Aitken's reasoning to be very carefully cabined. He certainly touches upon areas in proof, specifically with respect to identification, that are weaknesses in the case. But the point that he's making is not that habeas is granted because of some inability to prove beyond a reasonable doubt. All of that goes to the smaller point of, were the Brady violations here material? Would they have reasonably had an effect? But you see, the moment he does that, he doesn't need to reach anything else because habeas is granted, the guy is free. And if that were the only problem, I would think that you would go and try him again. But what Judge Aitken does say, right before he goes into the Brady analysis, is that he will only go into detail on the basis for relief that he is actually granted. Exactly. And I'm kind of interested also in the fact that you didn't try him again. You know, this is, in effect, he gave a conditional habeas, you can drop it. And that's what makes me think that, just impressionistically, that this is a very different case from most. And let's keep in mind that this guy was sent to jail for 17 years. Yes. That now it's clear that he was not. Now, you know, when you're sent to jail for 17 years, you've suffered a heck of a lot. Not having been in the shoes of those prosecutors, it's hard for me to represent exactly why he was not re-tried. Of course. But I believe the number he was, the operative number he was 15. I believe Mr. Jimenez had served 15 out of 23 years for which he had been sentenced. So it is possible that the fact that he had completed the majority of that sentence factored into the prosecution's analysis. But I still want to bring us back to where I started, which is, however severe the identification of Brady claims here that Judge Etten made, we're reading a 12B6 where specific torts had to be alleged. And those torts have difficult elements and relatively high bars to achieve. So on malicious prosecution, as the court knows, the defendant has to have commenced or continued a criminal proceeding. That's the first of four elements. Here, our defendants, the two initial detectives who worked on the case, did the very opposite of that. They closed the case. They released the defendant dissatisfied with the fact that their witness was no longer a property. You said commenced or continued, and it's true they didn't continue because they released him. But speak to commence. Under New York State law, a criminal proceeding commences with the filing of the accusatory instrument. So there may be a criminal court complaint that is filed before a presentation is made to a grand jury. Our position would be that no criminal conceded, no criminal proceeding was commenced here. And to the extent that my friend sort of, you know, there's case law, of course, that suggests that there are instances in which a police officer can help spur on a criminal investigation. Those are instances in which, and Bermuda lists a couple of them, you know, sort of giving examples. Those are specific instances in which the detectives had contact with the prosecution, urged them to continue on with the prosecution, provided supportive evidence. But isn't it reasonable to think that what they said originally, the first two, was what moved Stratford later when he was assigned to reopen? That he looked at that, and that was the things that they started to commence if they didn't actually commence inventing that led them on? Detective Stratford had the benefit of two things that didn't exist in the previous case. First, he had more witnesses. Yeah, but wasn't, that's not my question. My question is, wasn't he influenced by the semi-commencement by Serrano? And isn't that enough in terms of a malicious prosecution? I would say that Stratford essentially started from scratch. He conducted his own photo-array procedure after the fact. He interviewed the witness, Blalock himself. He interviewed these other two witnesses for the first time. I mean, it doesn't strike me as a meaningful continuation. Certainly not a criminal crime. Again, my question is, is there enough evidence that this was not just starting from scratch to get by 12B6? Because again, we're not saying that even summary judgment shouldn't be under, but was the behavior of the original ones enough so that a claim that it affected Stratford's then behavior gets by 12B6? I don't see our adversary making any particular claim to that effect in the motion. I mean, certainly in his briefing, he makes the point that this investigation had started already 17 years before. And certainly there is a factual narrative that describes the history of the case. But I don't believe, for the purpose, to the extent that we're asking whether he pleaded this connection, I don't believe it was sufficiently pleaded. And I would also add, of course, there's at least two other elements of malicious prosecution that are not sufficiently pleaded here. There's the notion that the proceeding be instituted by malice, which is conclusorily stated by our adversaries, but not imbalanced upon in any way apart from the fact that the case is weak, so there must have been malice. And then there's also the element of probable cause, which this court has just pointed out. As soon as there's an indictment, let alone a criminal conviction, as soon as there's an indictment, there's a difficult hurdle. Now, here is my problem with that. We don't know exactly what was said to the jury. We don't know it, because the court looked at a few jury things, but didn't look at everything. The claim is that these things which were said, and let's assume that they were false for the moment for that purpose, were done the same way before the grand jury. Is that plausible enough to get by 12b-6 again, so that then when we come to trial, we see whether these things were in fact. If they weren't, then you're right. The precedent seems clear to me, Your Honor, that a complaint has to allege fraud, perjury, suppression of evidence, or other bad faith to that degree. Certainly, we have a complaint that characterizes police conduct here as fraudulent. The word fabricated evidence is repeated in a few places, but there's no allegation that evidence was fabricated. The allegation is that the evidence was weak because of what might be characterized charitably or otherwise of sloppy police practice. But that itself, and I believe Bermuda's, I'm sorry, Delmata, I believe is the case, that says that there's a big difference between the two cases, between sloppy or unthoughtful police work and deliberate coercion of a false identification. There's no factual support for the notion that any of these witnesses were coerced. My friend points to the fact that two young witnesses were brought into the police precinct at the same time, and the word confronted appears in the DD-5s to describe the conversations that the police had with them. That's not the same thing as saying that a confession was coerced. Well, so they point to that, and just as an example, the change from Blaylock's original description and statement of what he saw to his identification of Mr. Jimenez, who doesn't meet those descriptions. And so between the original description and then whatever sort of happens in the room with Ramrup comes out something else, is that an available, plausible inference that ultimately the identification, among the other things, led to a fabrication of the testimony that then persisted throughout. I don't think that the factual support- I mean, that's not an argument just that it's weak. That's a contention that there's enough sort of smoke of distinction following this incident to conclude fire. I just don't think the factual allegations are there. And in fact, the district court points out in its opinion below, not the habeas opinion, the decision that's on appeal, that Mr. Blaylock's testimony was consistent throughout the criminal proceeding. It was no secret to the jury that he believed the man's name was Leon, and it was no secret that he had told the police as much. In spite of that, we have an indictment and we have a conviction through which a jury was evidently convinced by proof beyond a reasonable doubt. So, I mean, the fact certainly, as summarized by the district court, do not conclude that there was any material difference in how Mr. Blaylock presented the events of that day. You know, there may be the opinion on the other side here that it was not credible because it was inconsistent with other evidence. But the grand jury evidently did not reach that conclusion, nor did the pedigree. Can you address the braving? Yes. Now, there are, to be clear, two ways to sufficiently allege this Monell claim. It either would be intentionality, which every fact finder has found was not present here, or would be through this policy of deliberate indifference that has been alleged against the Bronx DA's office in the late 1980s. Connick is a very important case here. There, the court was looking for a pattern of failures to disclose blood evidence. And the reason it was doing that is because you need a pattern of not just Brady violations, but similar Brady violations to the type at issue in the case. Appellant has not alleged that here. Now, he has admittedly provided... Did the district court rule on any of this part, or did they just say there was no Brady violation, period? The district court found that there was no intentionality. But I believe that the district court was also dissatisfied. Yes, the district court made the point that, based on the fact that there were no prior violations by this assistant district attorney, based on the fact that it was not a flagrant and intentional... Well, was it a finding? I mean, suppose we find either that the kind of intentionality was not needed, or that intentionality that was needed was here. Can we say that on that finding, the district court ruled, nevertheless, there isn't a pattern? Now, opposing counsel asks us to rule that there was a pattern. To rule that the allegations are sufficient to... Right. ...for, if true, to establish a pattern. I'm looking here at the district court opinion. She doesn't. Right. I'll save you time.  I mean, you know, it notes that, you know, there's an allegation of purported systematic violations, and that that is a myth. But I agree with the court that essentially what is discussed is the degree of intentionality of this case. But Connick already tells us that the pleading as to this alleged systemic failure is not sufficient, because what you have to plead is a pattern of errors of the type. And, you know, Connick interpreted this narrowly. Of the type in Connick was violations related to failure to turning over the results of a blood test. Here, I think it's fair to say the equivalent would be the reason for the Brady or habeas grant. Failure to turn over sort of full-bodied evidence related to an agreement between the prosecution and the witness in their favor. Well, or that typically the state has used people who are not reliable and whose reliability was not then admitted or made known to the defense. I think that would be an acceptable theory, yes. But it's not a theory that has been presented by the complaint. The only theory presented by the complaint is that the Bronx DA's office has a certain number of Brady violations over the course of, I think it was 17 years. But over the course of those 17 years, only three Brady violations over 14 years pertained to failure to turn over potentially exculpatory evidence relating to an agreement with the witness. Under Connick, that would not nearly be enough to satisfy the standard of requiring an office to conduct more training or more discipline. And I would note that the prosecutor's office in Connick, this policy that the Supreme Court was satisfied by, didn't actually have formal Brady training at all. Where, of course, here it's not alleged that that's the case with the Bronx DA. It's alleged more specifically that they haven't done enough. May I ask you a moment about the state negligence? Ooh, I was afraid of that, but yes. I mean, I'm a little confused, because on the one hand they said, we're not doing it, but that was based on the fact that there was no federal claim. Now, then they tell me there's a footnote which says, if there is a federal claim, we bring that back. Now, isn't that enough to bring it back? Or is it? Or what's going on? I think it would be enough if it had not been forfeited by our adversaries. I think it would be enough if it had not been forfeited by our adversaries. I think that's our position here. It was clearly raised, there was an opportunity to do so here, and it wasn't. That is the thrust of our argument. I'm inclined to make a few corrections to what I think were some misstatements by my friend about sort of the degree of specific findings in the habeas opinion. But at the end of the day, the real question is not the number of facts about which the habeas opinion was right.  Can I just, real quick, your view? I mean, it's a little bit of a numbers game, but for Manel, what would you deem a sufficient number within a relevant time period? Right. Well, the easy way out is to say not 3 over 14 years. How about 7 over 14? I think still probably not. I mean, sort of, you would have to look at the number of cases that an office is handling. I know that hundreds of cases are arraigned on a daily basis, even in a small borough. Yeah, I mean, it's, you know, I would hesitate to put a number on it. But I think that we are firmly in the camp of Connick in the sense that there was not a clear and repeated trend that would have put the office on notice. I mean, deliberate indifference is a high standard. And I suppose you could say it's an even higher standard when the relief you're seeking on the part of the district attorney's office is not just training, which is already occurring, but a longer record of punishment based on these every few years violations. You know, I would say if the type of violation is only occurring every few years, I don't think that a Manel claim can result from that. Yeah. So because the appellant has not pleaded what he must plead, I'd urge the court to affirm the dismissal. Thank you. Just to be clear, affirm on an alternative ground? Yes, as far as the Manel is concerned. Yes, thank you. So Judge Calabresi, I'll start with my promised footnote, which is on page 73 of the brief, which is the last one, footnote 9. The motion court dismissed plaintiff's state law claims because it did not find any constitutional violations by any individual defendant. These claims should be restored alongside plaintiff's remaining constitutional action. Thank you. Then I want to talk quickly about initiation and then also get to Manel. I want to emphasize two things. First, counsel made reference to Stratford starting from scratch, and that simply isn't the case. I'm sorry, Your Honor. Stratford testifies at trial that after he got the case, the first thing he did was to reach out to Serrano and talk to him. That's on page 677 and 678. Second, the complaint clearly pleads that he picks up where they left off, and you can look in particular at paragraph 63 of the complaint. Counsel also, as to initiation, neglects to mention that Serrano talked to Mattaway and also testified at the criminal trial. This court found in Carruthers that when the prosecution is calling somebody as a witness, that can be taken as akin to initiation, particularly at the pleading stage. He testified he didn't remember anything about it, right? He testified that he didn't remember about it, but he certainly didn't say it wasn't true. And we can also always, I think, certainly at 12b-6, read between the line of what a prosecutor chooses to ask, and we can usually assume that they talked about a heck of a lot more than they put in front of the jury in a planned direct. Then on the Monell claim and the issue of pattern, it's always a thorny question to figure out what represents the appropriate pattern. Here the complaint alleges the connective tissue, which is that no matter what they did in pushing an ethical boundary, there would be no discipline, and I think that links together disparate types of misconduct. At a minimum, I would say that Brady and Rosario claims for these purposes should travel together, because they're both discovery violations of a similar type entrusted to a prosecutor. And third, the complaint also incorporates a law review article that makes reference to 72 instances of misconduct where no discipline resulted, and certainly 72 is enough. The city knows what these are. They produced them in another case, and that represents a plausible allegation that there are enough cases to make out a pattern. Can I just ask you, if you add the Rosario claims, what does that bring the number up to? I believe it is 14, Your Honor. But I would say that at this stage, and we talk about this in our brief, there simply were no guide rails in this office. No matter what somebody did, and this was true over decades, they could expect that there would be no discipline. The one time that anybody was disciplined over a remarkable three-decade period of time, he received a small dock in his pay that was immediately offset by a bonus and then a raise. And so ADAs in this office knew that they could push a boundary and they would face no consequence, but that if somebody was acquitted, they might face a consequence. The way that that apathy by the policymaker manifested itself here may well have been a Brady violation, but that violation, that failure to discipline, that lack of supervision of what ADAs were doing, wouldn't manifest itself in only one way, nor should it be expected to, and for those reasons it represents a plausible claim. If the court has no other questions, we would rest on our brief. Thank you very much. Thank you. We'll argue about both sides. Thank you, Your Honor. Very good. So that's our last case on the calendar for today.